UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY ARTHUR DONOVAN,

       Plaintiff,                 Civil Action No. 12-14671

     v.                      District Judge Gerald E. Rosen
                                Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

       Defendant.
_____/

**REPORT AND RECOMMENDATION TO**
**GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [9] AND**
**DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]**

In the spring of 2010, Plaintiff Gary Donovan experienced a number of difficult life events that triggered depression, which, in turn, led to multiple hospitalizations for suicide attempts. In December 2010, not long after his second hospitalization, Donovan filed for period of disability and disability insurance benefits under Title II of the Social Security Act. (Dkt. 7, Administrative Transcript ("Tr.") 130.) Donovan's application proceeded through the Social Security Administration's review process, and, in February 2012, an Administrative Law Judge acting on behalf of Defendant Commissioner of Social Security concluded that Donovan was not under a "disability" as that term is used in the Social Security Act. (Tr. 18-30.) After the Administration's Appeals Council denied review in September 2012, the ALJ's decision became the Commissioner of Social Security's final decision. (Tr. 1) Donovan then appealed here. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 9, 14). For the reasons set forth below, this Court finds that the ALJ failed to

adequately address whether Donovan is entitled to a closed period of disability benefits because of the number of days that Donovan would have had to miss work during 2010 and 2011 due to his four hospitalizations. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 9) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 14) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REVERSED.

## I. BACKGROUND

Prior to 2010, Donovan had not experienced mental-health problems. In the first half of 2010, however, the stressors in Donovan's life increased and he became depressed. In particular, he was working for a window repair company, but the work was "slow" and so Donovan was stressed about his finances. He discovered as well that his wife was having an affair and he had also recently become responsible for caring for a disabled uncle. Donovan was having difficulty sleeping. Loss of appetite resulted in weight loss—40 pounds. Then, on May 5, 2010, Donovan, while driving his company's vehicle, spotted the man with whom his wife was having an affair. A fight ensued. Because of the company vehicle, people in the vicinity reported Donovan's assault to his employer. That event, combined with prior verbal disagreements with customers and the company's downturn in business, resulted in the company releasing Donovan. Less than two weeks later, on May 16, 2010, Donovan went to the emergency room because he had been contemplating suicide for two days. Donovan was ultimately admitted to the hospital a total of four times because of suicide attempts or plans.

*First Hospitalization*

Donovan was hospitalized on May 16, 2010 because of suicidal thoughts. (Tr. 205, 222-27.) When Donovan arrived at the hospital, his mood was "agitated" and his affect appeared "somewhat angry." (Tr. 208.) As Donovan's stay progressed, however, he engaged in "group activities and counseling" and, by discharge, Donovan was demonstrating the ability to care for himself. (Tr. 205.) Donovan's behavior had become "cooperative," his affect "appropriate," and his memory and attention, "fair." (Tr. 205.) Donovan's discharge diagnoses were Major Depression, severe, chronic, recurrent without psychotic features. (Tr. 205.) He was assigned a Global Assessment Functioning ("GAF") score of 60. (Tr. 205.)[1] Staff provided prescriptions for Celexa (for depression), Ativan (for anxiety as needed), and Ambien (for insomnia as needed). (Tr. 212.) Donovan was discharged on May 20, 2010 and directed to follow up with outpatient mental-health treatment. (Tr. 206.)

A few days later, Donovan sought treatment from his primary care physician for "panic attacks and bad anxiety." (Tr. 265.) Donovan, however, was not suicidal. (Tr. 265.) The physician noted, "[patient] encouraged to continue Celexa and Ativan and [follow up] with therapist[.]" (Tr. 265.)

In June 2010, nurse Cathy Casetta at Genesee County Community Mental Health performed a behavioral health screening. (Tr. 189-95.) Donovan described himself as nervous with difficulty controlling his worry. (Tr. 190.) He had not, however, been "act[ing] depressed/sad most days" and

---

[1] A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV*"), 30-34 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32.

3

had not, in the prior two weeks at least, had thoughts of harming himself or others. (Tr. 190.) Although Casetta assessed Donovan's mood as "anxious," she identified Donovan's attitude as "cooperative," his affect within normal limits, and his thought process as "logical/coherent." (Tr. 191.) She provided a "rule out" diagnosis of "Adjustment disorder [with] mixed anxiety and depress[ion]" and assigned Donovan a GAF score of 60. (Tr. 194.)

In August 2010, Donovan returned to his primary care physician. (Tr. 263.) The doctor noted that Donovan was having difficulty paying for his mental health treatment. (Tr. 264.) Nonetheless, it appears (the physician's notes are handwritten) that Donovan was "not suicidal or depressed at this time." (Tr. 263.)

*Second Hospitalization*

Things changed in October 2010. On the evening of October 9, Donovan "[g]ot drunk" and attempted suicide with blood pressure pills. (Tr. 241.) He would later explain that he "just didn't want to be around anymore." (Tr. 241.) Donovan ended up in the emergency room for overnight monitoring. (Tr. 241; *see also* Tr. 220-21, 249-50.)

The next morning, Becky Glinieki, a social worker associated with Genesee County Community Mental Health, conducted a "crisis screening." (Tr. 229-42.) Donovan's stressors included not having a job or health insurance, and going through a divorce. (Tr. 241.) Glinieki noted that Donovan was "disheveled and unkempt in appearance," that he appeared "very depressed," and that he spoke softly and avoided eye contact. (Tr. 241.) She provided that Donovan had "become increasingly depressed over life events." (Tr. 241.) Glinieki assessed Donovan's GAF at 35. (Tr. 236.) She recommended "crisis residential" treatment: treatment for persons with "*substantial* signs and symptoms severe enough to cause seriously disordered and/or bizarre behavior, which *seriously*

4

interfere[s] with [activities of daily living] so that [the] person cannot be effectively treated at a lower [level of care]." (Tr. 238 (emphases in original).)

Accordingly, later that day, Donovan was admitted to a behavioral health and rehabilitation facility. (*See* Tr. 248.) The next day, October 11, 2010, it appears that a psychiatrist evaluated Donovan (the signature is illegible and the Court cannot otherwise identify the individual's credentials). (*See* Tr. 244-45.) The psychiatrist diagnosed Bipolar Affective Disorder, mixed; assigned a GAF of 30; and prescribed Depakote, Klonopin, and Sinequan. (Tr. 245, 248.)

On October 13, 2010, apparently while Donovan was still receiving inpatient treatment, Dale Potter, a limited licensed counselor, completed a psychosocial assessment of Donovan. (Tr. 302-20.) Potter explained that Donovan had not been able to gain employment, that "[h]is identity seemed tied to his worker life," and that this "led to depression and two suicide attempts." (Tr. 319.) Potter further noted that Donovan had stopped taking his medication after his first suicide attempt because "he did not like it." (Tr. 319.) Potter observed that Donovan's appearance was "[d]isheveled," he had "[l]anguage [d]elay," and his mood was "sad/depressed." (Tr. 311.) Potter summarized Donovan's condition as follows:

> [Mr. Donovan] currently need[s] constant medication/psychiatric support services. He also needs case management to help him through adjustment and transition as well as re-training needs. Therapeutic services will also benefit Gary and help him work through his suicidal issues, depression, self-worth and bi-polar needs. If Gary is and stays properly medicated long term stability seems possible with proper support services and coordination.

(Tr. 319.) He noted, "[Mr. Donovan] [is] [c]urrently [m]edicated and living within a supportive environment but will be returning home within 24 hours and could easily be or become a risk." (Tr. 314.)

A few days later, on October 19, 2010, Donovan underwent an evaluation with Dr. Janet Warner, a psychiatrist at Genesee County Community Mental Health. (Tr. 321-29.) Donovan was still having "[a]ctive [r]ecurrent [t]houghts" of suicide" but had no "[a]ctionable [p]lans." (Tr. 322.) Dr. Warner opined, "Concentration is only good with effort (he is processing very slow)." (*Id.*) She diagnosed Donovan with Major Depressive Disorder, single, severe, without psychotic features and Adjustment Disorder with depressed mood. (Tr. 327.) She also provided a rule-out diagnosis of bipolar disorder and thought that Donovan's GAF score was 50. (*Id.*) Dr. Warner believed, however, that Donovan's "prognosis [was] good with treatment." (Tr. 325.)

*Stage Agency Consultative Exam and File Review Opinion*

In March 2011, Dr. Matthew Dickson, a psychologist, evaluated Donovan for Michigan's Disability Determination Service, a state agency that aids the Social Security Administration in evaluating claimants. (Tr. 272-74.) Donovan described his symptoms this way:

> I just am having a hard time being around people. Since last April,
> I've had a total nervous breakdown. I can't deal with life anymore.
> I've tried to hurt myself twice. I get paranoid around people. I get a
> loss of words. I can't really speak. I get very, very nervous. I can't
> focus on one thing. I just can't keep track of things.

(Tr. 272.) Donovan also explained, "I've pretty much gone off into seclusion these last few months." (Tr. 272.) Donovan described his self esteem as "very low," and Dr. Dickson remarked, "[h]e conveyed an attitude of exaggerated self-sympathy, helplessness and dependence." (*Id.*) Dr. Dickson diagnosed Major Depressive Disorder, moderate, and Cluster B Personality Disorder Traits. (Tr. 274.) He rated Donovan's GAF at 53. (*Id.*) He also opined, "It is my impression that [Mr. Donovan's] mental abilities to understand, attend to, remember, and carry out instructions are mildly

6

impaired. [His] abilities to respond appropriately to co-workers and supervision and to adapt to change and stress in the workplace are moderately impaired." (Tr. 274.)

A few days after Dr. Dickson completed his exam, Dr. Dennis Beshara, also acting at the request of Michigan's Disability Determination Service, reviewed Donovan's then-existing medical file, including Dr. Dickson's report, and offered a medical opinion. (Tr. 76-86.) Although aware of Donovan's two hospitalizations, Dr. Beshara opined that Donovan had not experienced "repeated episodes of decompensation, each of extended duration." (Tr. 81.) He further opined that Donovan was "capable of performing unskilled work." (Tr. 64-65.)

*Third Hospitalization*

Sometime not long after 10:00 p.m. on April 8, 2011, Donovan took 15 Buspar, 9 Depakote, and 4 Doxapine tablets in an attempt to overdose. (Tr. 279.) He was brought to the emergency room via police or ambulance. (Tr. 279.) Upon admission, a mental status exam revealed that Donovan had "depression to the extent that normal life patterns and functioning [were] severely disrupted," that he had "poor insight as evidenced by denial of diagnosis or recognition of need for treatment," and "poor judgment as evidenced by impulsivity or making decisions without prior consideration of consequences." (Tr. 286.) While hospitalized, a psychiatrist, nurse practitioner, or physicians assistant saw Donovan on a daily basis, and Donovan was stabilized with medication. (*Id.*) At discharge, Donovan "denied suicidal/homicidal ideation and reported a decrease in psychiatric symptoms" and the hospital staff "instructed [Donovan] to continue with medications as prescribed and to follow up with out-patient treatment/support through an appropriate community agency and/or provider." (Tr. 287.) Donovan was discharged on April 11, 2011. (Tr. 286.)

*Fourth Hospitalization*

At some point in 2011, Donovan began staying with his sister. (*See* Tr. 296.) On August 6, 2011, Donovan walked up to his sister and said, "What I tried to do didn't work, I threw it up, so you better call an ambulance." (Tr. 296.) Donovan's sister, knowing Donovan's prior incidents, brought him to the emergency room. According to the admitting physician, this then occurred:

> [The patient's sister] said that [Mr. Donovan] basically gets prescriptions and he does not take them and then he will take them all at once. Today, he took a bottle of 30 . . . Zoloft . . . . The patient claims he just was trying to get to sleep and I said[,] "You took 30 pills all at once?" He said[,] "No I took them over an hour and a half." I said, "Did you really think the 30 pills were just going to make you feel sleepy and not kill you?" And he said, "Yes". I said[,] "You don't believe that, you known better than that, you've done this before." And he said[,] "Well I am not taking any charcoal or any medicine to reverse it". I explained to him that we would have to put the charcoal in him and if necessary [tie] him up and put it [in] by nasogastric tube. He [nonetheless] insisted[,] and [so we put it in by tube].

(Tr. 296.) Although Donovan was not discharged until August 13, 2011, records for the remainder of his hospitalization are not part of the record. (Tr. 297.)

It appears that in October 2011 Donovan sought some type of mental health treatment, again at Genesee County Community Mental Health. (*See* Tr. 331 (noting October prescriptions).) In November 2011, a mental health professional at Genesee provided that she had reviewed a "Psychosocial Assessment," apparently the one from more than a year earlier (*see* Tr. 23, 329), and found that it "remain[ed] current and accurate" (Tr. 329). In December 2011, a physicians assistant at Genesee performed a medication review. (Tr. 330-34.) According to the physicians assistant, Donovan reported that he would soon be getting Medicaid assistance, that he had been eating and sleeping "ok," and that his "moods ha[d] been ok and stable over the past [two] months." (Tr. 331.)

The "impact of medication(s)" was rated as "good" and Donovan denied side effects. (Tr. 332.) At that time, Donovan was taking several depression or anxiety medications: Depakote, Klonopin, and Sinequan; he was to start Buspar. (Tr. 333.) The physicians assistant's diagnosis was only of the "rule out" variety, i.e., to rule out Bipolar Disorder, not otherwise specified. (*Id.*)

*Application for Social Security and Testimony Before the Administrative Law Judge*

In December 2010, not long after his second hospitalization and evaluation by Dr. Warner, Donovan applied for social security disability benefits alleging that he had become disabled on May 5, 2010. (Tr. 18.) After the Social Security Administration's initial denial in March 2011, Donovan requested an administrative hearing, and in February 2012, he appeared, with counsel, before Administrative Law Judge Peter N. Dowd. (Tr. 36-75.)

In discussing his personal history, Donovan provided that he was 44 years old, had completed the ninth grade, and had "one biological son," age 23. (Tr. 44.) Donovan testified to having a girlfriend for the past year. (Tr. 63.)

When ALJ Dowd asked why he had stopped working in May 2010, Donovan provided three answers. He said that there was a "lack of work." (Tr. 47.) He also explained that when driving "a company vehicle" he saw the guy "that [my wife] was having an affair with" and confronted him. (Tr. 48.) "And I beat him up, you know, passers by called my company and, you know, told them, you know, what their employee was doing." (*Id.*) Third, Donovan testified that he had also been having some problems with customer service: "I just got to the point where the customer wasn't always right." (Tr. 49.) "Just listening to their complaints all day, I just got to the point I didn't care about . . . . Like their problem wasn't—it was no big deal and their complaint wasn't nothing to be

9

complaining about." (Tr. 65.) Donovan explained that he had argued with customers to the extent that they asked him to leave their property. (*Id.*)

Donovan described several symptoms associated with his depression or bipolar disorder. "I'm up all hours of the night," he noted. (Tr. 59.) Donovan said he isolated himself in the basement or his bedroom for significant amounts of time: "I just want to be alone." (Tr. 66.) He testified, "[when around other people,] I get nervous, anxious." (Tr. 66.) "I just have a feeling of hopelessness I guess and I have no place." (Tr. 69.) When asked if his mental-health treatment improved these symptoms, Donovan responded, "I don't really think so." (*Id.*)

Donovan also testified to his daily activities. He acknowledged being capable of bathing and dressing himself. (Tr. 59.) Although he did not make meals, he washed his own clothes and "[o]ccasionally" helped clean the house. (Tr. 60.) He would also occasionally walk to the grocery store "around the corner." (Tr. 62.) Since the August 2011 overdose, Donovan's sister took responsibility for giving Donovan his medications. (Tr. 57-58.)

After Donovan finished testifying, ALJ Dowd solicited testimony from a vocational expert to determine whether jobs would be available for someone with functional limitations that he thought approximated Donovan's. In particular, ALJ Dowd asked about job availability for a hypothetical individual of Donovan's age, education, and work experience who was capable of a full range of physical work, but could only perform "simple routine and repetitive work activities in a stable work environment," could only "tolerate superficial contacts with supervisors and co-workers," and could not "work with the general public." (Tr. 71.) The vocational expert provided that there would be jobs that this individual could perform, including hand packager, package sealer, and cleaner or polisher. (Tr. 72.)

10

Answering a question from Donovan's counsel, the vocational expert said that if someone had to miss work more than one day per month, he could not maintain full-time, competitive employment. (Tr. 73-74.)

## II. THE ALJ'S DETERMINATION

The Social Security Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI). And "disability" is to be determined using the following five-step process:

> 1. If claimant is doing substantial gainful activity, he is not disabled.

> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis

reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Applying this framework, ALJ Dowd concluded that Donovan was not under a "disability." (Tr. 18-30.) At step one, he found that Donovan had not engaged in substantial gainful activity since May 5, 2010. (Tr. 20.) At step two, he found that Donovan had the following severe impairments: "bipolar disorder with episodes of symptoms of depression." (Tr. 21.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 24-25.) Between steps three and four, the ALJ determined that Donovan had the residual functional capacity to perform

> a full range of work at all exertional levels, but with the following nonexertional mental limitations. The claimant from a mental standpoint can perform work that involves simple, routine, repetitive tasks in a stable work environment. The claimant from a mental standpoint can perform work that involves superficial contacts with supervisors and coworkers, but no work with the public.

(Tr. 26.) At step four, the ALJ found that Donovan was unable to perform any past relevant work. (Tr. 28.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Donovan's age, education, work experience, and residual functional capacity. (Tr. 29-30.) The ALJ therefore concluded that Donovan was not disabled as defined by the Social Security Act from the alleged onset date through the date of his decision, February 28, 2012. (Tr. 30.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the

record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

13

## IV. ANALYSIS

Plaintiff says that two aspects of the Commissioner's decision lack substantial evidentiary support. First, Donovan asserts that the record dictates a finding of disabled at step three, i.e., that he met or medically equaled Listed Impairment 12.04 for disorders "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome," 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04. (Pl.'s Mot. Summ. J. at 5-13.) Donovan next argues that the periods of decompensation associated with his four suicide attempts show that he would have missed work more than one day per month and, therefore, according to the vocational expert's testimony, he would have missed too much work to stay employed. (Pl.'s Mot. Summ. J. at 14; *see also* Dkt. 15, Pl.'s Reply at 3-5.) The Court finds that second claim of error warrants remand , while  the first does not.

### A. Plaintiff Has Not Shown That the ALJ Committed Harmful Error At Step Three

To meet or medically equal Listing 12.04, the record must support a finding that Donovan's mental-health condition satisfied the "A" criteria and either the "B" or "C" criteria. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04. Focusing on the Listing's conjunctive aspect, ALJ Dowd did not analyze the A criteria; he instead concluded that the record did not support satisfaction of either the B or C criteria. (*See* Tr. 24-25.) To satisfy the B criteria, a claimant must suffer from at least two of the following: "marked" limitations in activities of daily living, "marked" limitations in social functioning, "marked" difficulties in concentration, persistence, or pace, or "repeated episodes of decompensation, each of extended duration." *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04.B. The ALJ, however, concluded that Donovan had only (1) "mild" limitations in activities of daily living, (2) "moderate" limitations in social functioning, (3) "moderate" limitations in concentration,

14

persistence, or pace, and (4) "two episodes of psychiatric decompensation of extended duration." (Tr. 24-25.)

Donovan challenges two of these four findings. He claims that the record established "marked" limitations in activities of daily living and that he had experienced "repeated episodes of decompensation, each of extended duration" as that term is defined in the Listings. (Pl.'s Mot. Summ. J. at 5-13; Pl.'s Reply at 1-2.)

Before turning to the merits of this claim, the Court notes that the analysis can be simplified. As to two of the B criteria (social functioning and concentration, persistence, or pace), Donovan does not challenge the ALJ's "moderate" findings. (*See generally* Pl.'s Mot. Summ. J.; Pl.'s Reply.) Donovan has therefore forfeited any claim that the ALJ erred in finding him less than markedly limited in those two criteria. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003). So to demonstrate that the ALJ's B Criteria findings justify reversal or remand, Donovan must show that he has *both* "marked" restrictions in activities of daily living *and* "repeated episodes of decompensation, each of extended duration." *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04.B. Because the record does not permit the latter finding, however, the Court forgoes an analysis of the former.

According to the Social Security Administration's Listing of Impairments for Mental Disorders, "episodes of decompensation" are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00.C.4. They may be "demonstrated" by "an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less

15

stressful situation (or a combination of the two)." And they may be "inferred" from medical records

"showing significant alteration in medication; or documentation of the need for a more structured

psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly

structured and directing household); or other relevant information in the record about the existence,

severity, and duration of the episode." *Id.*

The  Listing of Impairments for Mental Disorders also provide a definition for "repeated

episodes of decompensation, each of extended duration":

> The term *repeated episodes of decompensation, each of extended duration* in these listings means three episodes within 1 year, or *an average of once every 4 months, each lasting for at least 2 weeks*. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00.C.4 (second emphasis added).

Focusing on the emphasized language, the first of Donovan's four hospitalizations began on

May 5, 2010; the last ended on August 13, 2011. As this was just short of 16 months, Donovan's

episodes met the frequency requirement of "an average of [one] every 4 months." *Id.* The question

thus becomes whether "each last[ed] for at least 2 weeks." *Id.*

Donovan acknowledges that none of his four hospitalization stays approached two weeks:

> Donovan's first hospitalization lasted from May 16, 2010 through May 20, 2010 (5 days). Plaintiff's second psychiatric hospitalization lasted from October 10, 2010 through October 14, 2010 (5 days). Mr. Donovan's third hospital stay lasted from April 8, 2011 through April 11, 2011 (4 days). Plaintiff's fourth psychiatric hospitalization occurred from August 6, 2011 through August 13, 2011 (8 days).

(Pl.'s Reply at 3 (internal citations omitted).) But Donovan claims that this is not fatal to his argument because his "periods of decompensation continued both prior to and subsequent to his hospital admissions." (Pl.'s Reply at 2, 4; *see also* Pl.'s Mot. Summ. J. at 10-11.)

Substantial evidence in the record, however, supports the contrary conclusion.

By the time Donovan was discharged from his first hospitalization in May 2010, he had demonstrated the ability to care for himself. (Tr. 205.) In fact, over his five-day stay, his GAF score had improved to 60, a score indicating only "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *DSM-IV* at 34. Indeed, at his follow-up with his primary care physician on May 24, 2010, he was not suicidal (Tr. 265) and, in June 2010, Donovan reported that, on most days during the prior month, he was neither depressed nor sad (Tr. 190). Given all of this, the record simply does not support the claim that the May 2010 hospitalization was an episode of decompensation "lasting for at least 2 weeks."

As for Donovan's third hospitalization in April 2011, there is nothing in the record about how rapidly Donovan's symptoms increased to the point of decompensation, i.e., the severity of Donovan's symptoms in the days leading up to his admission is unknown. As for discharge, Donovan argues that he was still suffering from "depression to the extent that normal life patterns and functioning are severely disrupted." (Pl.'s Reply at 4 (citing Tr. 286).) But Plaintiff misreads the record: that finding was made during the "admission assessment/mental status exam." (Tr. 286.) It is true that Donovan's GAF score was only 45 at discharge (Tr. 286) and that this score indicates that Donovan had "serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* at 34. Still, it is far from apparent that "serious symptoms"

17

or "serious impairment" is equivalent to being in a decompensated state, and Donovan has not cited any authority suggesting that this is so. *Cf. Smith v. Colvin*, No. 2:11-0011, 2013 WL 1503883, at *11 (M.D. Tenn. Apr. 12, 2013), *report and recommendation adopted*, 2013 WL 1910504 (M.D. Tenn. May 8, 2013) ("Plaintiff's argument that his low GAF scores indicate that he meets Listing 12.04 is unavailing. Plaintiff is correct that Ms. Rummel assigned him a GAF score of 46, but GAF scores do not determine disability, nor do they determine whether a claimant meets or medically equals a Listing." (citation omitted)); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place. . . . If other substantial evidence (such as the extent of the claimant's daily activities) supports the conclusion that she is not disabled, the court may not disturb the denial of benefits to a claimant whose GAF score is as low as Kornecky's [40–45, 46, 52, 50-55] or even lower."). Further, Donovan "denied suicidal/homicidal ideation and reported a decrease in psychiatric symptoms." (Tr. 287.) And the administrative record does not contain documentation from the days immediately following this hospitalization. Given that the hospitalization period was for only four days, the record strongly suggests that the April 2011 episode of decompensation also was not one of "extended duration."

Donovan's fourth hospitalization, in August 2011, lasted for eight days. (*See* Tr. 296-97.) But again, the record is largely silent as to Donovan's condition immediately prior and after hospitalization. It appears, however, that Donovan did not seek further mental health treatment until October 2011. (*See* Tr. 331.) Thus, the record suggests that Donovan's  August 2011 was also not one "lasting for at least 2 weeks."

18

The Court assumes without deciding that Donovan's episode of decompensation in October 2010 lasted for more than two weeks. (*See* Tr. 321-29 (records indicating that at an evaluation 10 days after initial hospitalization, Donovan reported "[a]ctive [r]ecurrent [t]houghts" of suicide").) Even so, the record does not permit a conclusion that Donovan had "three episodes [of decompensation] within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00.C.4. At a minimum, substantial evidence supports the ALJ's conclusion that Donovan did not have repeated episodes of decompensation, each of extended duration. (*See* Tr. 25.)

Donovan makes two other related arguments that warrant discussion. First, he says that the ALJ wrongly combined his hospitalizations to form two extended-duration episodes of decompensation: "The ALJ fails to cite any authority within the Agency Regulations which would allow him to merge hospital admissions which on average were occurring approximately 6 months apart. The ALJ's sole purpose seems to be to reduce the number of Plaintiff's episodes of decompensation below Listing level." (Pl.'s Mot. Summ. J. at 11-12.) The Court agrees with Donovan that the following portion of the ALJ's narrative is questionable:

> I view the claimant's first two attempts in 2010 at using medication inappropriately to overdose himself as being one episode of psychiatric decompensation of extended duration. I note that between these 2 suicidal attempts the claimant did not go for mental health treatment. Thus, I have linked them together. I also view the next two attempts in 2011 as being another episode of psychiatric decompensation of extended duration. I note that during this period of time the claimant was not taking his psychotropic medication as prescribed and was not apparently receiving ongoing mental health treatment. Thus, I have linked these events together.

(Tr. 24-25.) But even if this analysis is erroneous, Donovan has not demonstrated how it was harmful. *See Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 648 (6th Cir. 2009) (holding that

harmless error analysis is applicable in the context of an ALJ's rating of a claimant's B criteria). In other words, when the episodes of decompensation are treated separately, as the Court has done, the evidence still does not show that Donovan's hospitalizations satisfied the Administration's definition of "repeated episodes of decompensation, each of extended duration."

Perhaps recognizing this, Donovan also argues that if the Court were to accept the ALJ's analytical approach, it would dictate a finding that he was in a state of decompensation "for at least [nine] months of [the] 16 month period" spanning May 2010 through August 2011. (Pl.'s Mot. Summ. J. at 12.) Donovan even takes the argument one step further: "following the ALJ's rationale of merging the admissions in 2010 and those in 2011, there is no reason not to continue that rationale and merge all four hospitalizations into one period of psychiatric decompensation from May 2010 through August 2011." (*Id.*) Donovan argues that under either approach, he would meet the C criteria associated with Listing 12.04 (and therefore would not need to satisfy the B criteria to satisfy the Listing). (*See id.*) Donovan apparently refers to this C criterion: "Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04.C. But, as the Commissioner has aptly noted, this alone does not satisfy the C criteria; rather the record must additionally show that Donovan had a "[m]edically documented history of a chronic affective disorder *of at least 2 years' duration* that has caused more than a minimal limitation of ability to do basic work activities." *Id.* (emphasis added). Donovan's claimed disability onset date is May 5, 2010, and the ALJ's decision was on February 28, 2012 (Tr. 18, 30)—the relevant time period, therefore, is less than two years. Apparently, Donovan now concedes this point: he does not pursue his C-criteria argument in his reply brief. (*See generally* Pl.'s Reply.)

20

**B. The ALJ Failed to Adequately Consider How Much Work Donovan Would Have Missed Due to His Four Episodes of Decompensation**

Although the factual basis for Donovan's second claim of error is again his episodes of decompensation, the legal ground is different. Donovan challenges the ALJ's step-five finding that he was capable of performing a substantial number of jobs by asserting that his episodes of decompensation would have required him to miss too much work to keep a job. Although Donovan's counsel did not develop this precise argument prior to, or even at, the administrative hearing before ALJ Dowd, counsel likely had the argument in mind when he asked the vocational expert about work absences (Tr. 73); the expert responded, "If the person were . . . absent at least one day a month[,] that would preclude the person's ability to maintain employment." (Tr. 73.) Pursuant to this testimony, Donovan now makes the argument explicit: "Based on the . . . episodes of decompensation alone[,] [the total number of decompensated days] would greatly exceed the amount of absences allowed . . . to be able to sustain employment[.]" (Pl.'s Mot. Summ. J. at 14.) Donovan calculates a total of 22 hospital days due to his four episodes of decompensation. (Pl.'s Reply at 3.) He then points out that the disability period adjudicated by the ALJ was 22 months (May 5, 2010 to February 28, 2012). (*Id.*) It follows, Donovan says, that he "would have been hospitalized 22 days during this 22 month period." (*Id.*) Donovan adds that because it was highly likely he would not have able to work at least one or two days surrounding each hospitalization (or at least some of them), the total number of decompensated days exceeds the vocational expert's threshold of "one day per month" (Tr. 73). (*Id.*)

It appears that substantial evidence supports the ALJ's implicit conclusion that Donovan's episodes of decompensation did not continue at their prior frequency after August 2011. After the August 2011 suicide attempt, Donovan's sister began managing Donovan's daily medicine intake.

21

(Tr. 55, 57-58.) Based on the absence of treatment notes in the record, Donovan did not obtain regular mental health treatment in the fall of 2011. In December 2011, at a medication review, Donovan reported that he would soon be getting Medicaid, that he had been eating and sleeping "ok," and that his moods had been "ok" and "stable" over the prior two months. (Tr. 331.) Indeed, the "impact" of Donovan's medications was rated as "good." (Tr. 332.) Donovan's hearing before ALJ Dowd was not until February 2012, and it appears that Donovan had not had any additional episodes of decompensation. (*See* Tr. 69.) In short, the record suggests the following: (1) Donovan did not decompensate during the six-month period following his August 2011 hospitalization; (2) Donovan, with his sister's aid, was in substantial compliance with his medications; and (3) those medications were working to stabilize Donovan's moods. It is reasonable to infer, therefore, that Donovan would not have experienced work-preclusive absenteeism from August 2011 onward.

But the ALJ was also supposed to look back in time because Donovan applied for period of disability benefits. (Tr. 136.)[2] Indeed, the ALJ acknowledged this in his decision. (Tr. 18, 30 (noting both "period of disability and disability insurance benefits").) The ALJ, however, did not specifically discuss whether Donovan should be awarded benefits for a closed period. To be sure, the ALJ's ultimate conclusion was that Donovan was not disabled from the alleged onset date through the date of his decision. (Tr. 30.) But this conclusion was based on the jobs identified by the vocational expert in response to the residual functional capacity assessed by the ALJ. The

---

[2]*See* Program Operations Manual System (POMS) § DI 25510.001 (May 10, 2011) *available at* http://policy.ssa.gov/poms.nsf/ lnx/0425510001 ("Based on the evidence, a disability adjudicator may find that the claimant's disability was for a continuous period of 12 months, but at the time of adjudication, the claimant is no longer disabled."); *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972) ("The Act itself does not provide for a closed period of benefits. However, we think it clear that such a closed period of benefits may be awarded.").

residual functional capacity, however, appears to have been only present- or forward-looking, and, in any case, made no mention of past days of decompensation. (*See* Tr. at 26 ("The undersigned finds that the claimant *has* the residual functional capacity . . . ." (emphasis added)).) Indeed, at multiple points in his narrative, the ALJ focused on Donovan's present or prospective condition. (Tr. 27 ("While I agree with [the claimant's counsel] that the claimant has had episodes of decompensation, I disagree with him that they have been so numerous that they *prevent* the claimant from working."); Tr. 27 (noting Dr. Beshara's finding that "claimant *remains* capable of performing a wide range of mental tasks involving unskilled work"); Tr. 28 (noting that Dr. Dickson found that "claimant *remains* mentally capable of performing a wide range of work tasks"); Tr. 28 (finding that the "claimant *is* able to engage in regular and routine activities") (all emphases added).) It thus appears that the ALJ did not consider the specific claim that Donovan's total decompensated days between May 2010 and the end of August 2011 (approximately a 16-month period), or May 2010 to the end of February 2012 (approximately a 22-month period), would have resulted in work-preclusive absenteeism during those periods.

This omission is especially troubling given the relative burdens at step five. At that point of the disability analysis it became the Administration's burden to establish that there were sufficient jobs in the national economy that Donovan could perform. *See Preslar*, 14 F.3d at 1110. Relevant to that inquiry is the number of days that Donovan would have missed work between May 2010 and August 2011 (or February 2012) due to decompensation. *Cf. Hawke-Dingman v. Comm'r of Soc. Sec.*, No. 11-15493, 2012 WL 5328674, at *12 (E.D. Mich. Sept. 11, 2012) (Michelson, M.J.) ("It is far from plain that a person requiring hospitalization as frequently as Plaintiff—69 days in less than three years (about two days per month)—would be able to maintain substantial gainful

employment."), *report and recommendation adopted as modified sub nom.*, *Dingman v. Comm'r of Soc. Sec.*, 2012 WL 5306218 (E.D. Mich. Oct. 29, 2012) (Steeh, J.) (remanding for further fact finding in view of evidence of continuing hospitalizations). Absent some discussion by the ALJ as to how Donovan's 22 days of decompensation (or more) during a 16- or 22-month period is reconcilable with the vocational expert's testimony that missing more than one day of work per month is work-preclusive, the Court cannot say that the ALJ carried his step-five burden. Remand, therefore, is necessary. *See Widener v. Astrue*, No. 08-107, 2009 WL 2778215, at *5 (E.D. Ky. Aug. 27, 2009) ("[B]ecause the ALJ failed to address whether Plaintiff was entitled to a closed period of disability, the Court concludes that remand is required so that the ALJ may make specific findings regarding whether Plaintiff's multiple surgeries during the three-year period beginning November 2000 rendered her disabled during that discrete period.").

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the ALJ failed to adequately address whether Donovan is entitled to a closed period of disability benefits because of the number of days that Donovan would have had to miss work during 2010 and 2011 due to his four episodes of decompensation. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 9) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 14) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REVERSED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).

24

Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).


                                        s/Laurie J. Michelson_____
                                        LAURIE J. MICHELSON
                                        UNITED STATES MAGISTRATE JUDGE
Dated:  September 9, 2013


                          CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing  was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 9, 2013.


                                        s/Jane Johnson_____
                                        Deputy Clerk


                                        25